UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────

No. 15-1041

─────────

CERES MARINE TERMINALS, INC.,

            Petitioner,

      v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR; SAMUEL JACKSON,

            Respondents.

─────────

On Petition for Review of an Order of the Benefits Review Board.
(14-0071)

─────────

Argued:  December 8, 2015            Decided:  March 24, 2016

                  Amended:  January 27, 2017

─────────

Before GREGORY, DUNCAN, and FLOYD, Circuit Judges.

─────────

Petition for review denied by published opinion.  Judge Gregory
wrote the opinion, in which Judge Duncan and Judge Floyd joined.

─────────

**ARGUED**: Lawrence Philip Postol, SEYFARTH SHAW LLP, Washington,
D.C., for Petitioner.  Ira Michael Steingold, STEINGOLD &
MENDELSON, Suffolk, Virginia; Sarah Marie Hurley, UNITED STATES
DEPARTMENT OF LABOR, Washington, D.C., for Respondents.  **ON
BRIEF**: M. Patricia Smith, Solicitor of Labor, Rae Ellen James,
Associate Solicitor, Gary K. Stearman, Counsel for Appellate
Litigation, Mark A. Reinhalter, Counsel for Longshore, UNITED
STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent

Director, Office of Workers' Compensation Programs, United States Department of Labor.

_____

GREGORY, Circuit Judge:

This case arises from a horribly tragic work-related accident. Samuel P. Jackson, an employee of Ceres Marine Terminals, Inc. ("CMT"), was operating a forklift when he accidently struck and killed his coworker, Paula Bellamy. After this event, Jackson, who was diagnosed with posttraumatic stress disorder ("PTSD"), filed a claim with the Director of the Office of Workers' Compensation Programs (the "Director") for disability benefits under the Longshore and Harbor Workers' Compensation Act ("LHWCA" or the "Act"), 33 U.S.C. § 901. The Administrative Law Judge ("ALJ") reviewing the claim determined that Jackson was entitled to benefits and the Benefits Review Board (the "Board") affirmed.

CMT now petitions for review of the Board's decision, arguing that a person bringing a claim under the LHWCA is required to satisfy the "zone of danger" test outlined by the Supreme Court's decision in Consolidated Rail Corp. v. Gottshall, 512 U.S. 532 (1994). "Under this test, a worker within the zone of danger of physical impact will be able to recover for emotional injury caused by fear of physical injury to himself, whereas a worker outside the zone will not." 512 U.S. at 556. Had the Board adopted such a test, CMT asserts, Jackson would have been precluded from any recovery under the LHWCA because he was not in the zone of danger and thus did not

3

suffer a compensable injury. In addition, CMT contends that the ALJ erred in failing to give the report of an independent medical examiner, appointed pursuant to 33 U.S.C. § 907(e), dispositive weight. We disagree on both points and therefore deny the petition.

## I.

## A.

On March 28, 2011, Jackson, employed by CMT as a longshoreman, was operating a forklift on a pier in Portsmouth, Virginia, when he accidently struck and killed Bellamy. At the time, Jackson was transporting barrels of container pins when he veered the forklift to his left to avoid being struck by a hustler truck that was backing up and carrying a forty foot container. When he veered, he hit Bellamy, a spotter, who had her back towards him. Jackson did not see Bellamy, and did not realize he had hit her until another spotter "hollered at [him] to let [him] know that [he] had just ran over . . . somebody." J.A. 61. Jackson immediately got off his forklift to help extricate Bellamy who was almost completely pinned underneath the forklift. Another forklift driver drove over and, with his machine, raised the back end of Jackson's forklift. Jackson and others worked to free Bellamy from under his forklift.

4

Once they were able to lift the forklift, it was apparent that Bellamy's condition was dire: Jackson testified that "[Bellamy] was bleeding from her mouth. Her arm was burned and pretty mangled, hanging off." J.A. 63. Jackson further testified that Bellamy's leg was wrapped around the axle of the forklift. For about ten minutes, Bellamy's condition was in full view until emergency vehicles arrived. By this time, approximately one hundred people gathered at the scene, including ambulance and fire truck personnel and CMT employees. During the entire time that the first responders worked to save Bellamy, Jackson stood ten to fifteen feet away, with a clear view of her.

After the ambulance left for the hospital, Jackson spent the rest of the day reporting the accident to the Portsmouth Police Department, Virginia International Terminals Police Department, the Occupational Safety and Health Administration, and CMT officials. Jackson testified that after his conversation with Gregory Concepcion, the superintendent for CMT, he sought medical attention.

B.

Jackson saw several medical professionals for mental health treatment after the March 2011 accident. Jackson visited Dr. Margaret Stiles, his primary care physician, on March 29, 2011, one day after the incident. Dr. Stiles noted that Jackson

5

was "acutely extremely upset, stressed," and diagnosed and treated him for PTSD. J.A. 351, 354, 360. At and around this time, Dr. Stiles recommended that Jackson not return to work because of his condition. On April 6, 2011, Dr. Stiles referred Jackson to Gregory Griffin, a licensed clinical social worker, for counseling. Griffin recommended brief supportive crisis-debriefing counseling and that Jackson not return to work for four to six weeks. Griffin diagnosed Jackson with an adjustment reaction with depressed mood.

After Jackson's family noticed "dramatic changes" in his behavior, they collectively "persuade[d]" Jackson to see Dr. Norbert Newfield. J.A. 286-87. Dr. Newfield, a clinical psychologist, first evaluated Jackson on July 11, 2011. Dr. Newfield found that Jackson suffered from PTSD with significant levels of anxiety and depression resulting from the work-related accident. Over the course of his treatment – from mid-2011 through 2013 – Dr. Newfield usually saw Jackson on a weekly basis, sometimes twice a week. On February 20, 2012, almost a year after the accident, Dr. Newfield noted that Jackson was still experiencing extremely bad nightmares and levels of guilt, shame, and grief that prevented him from

returning to work. Dr. Newfield monitored Jackson for suicide as well.[1]

Dr. Patrick Thrasher, a psychiatrist retained by CMT, conducted an independent medical examination of Jackson on September 14, 2011, and reviewed Jackson's medical records. Dr. Thrasher diagnosed Jackson with PTSD and major depression, and he concluded that these diagnoses were causally related to the work accident. Dr. Thrasher stated that the severity of Jackson's depression and PTSD rendered him incapable of returning to work. Dr. Thrasher further stated that with aggressive psychiatric treatment and psychotherapy, Jackson might be able to return to work within six to twelve months. After reviewing updated medical records, Dr. Thrasher, on February 12, 2012, noted that Jackson was undermedicated, and recommended a more aggressive psychotropic treatment targeting Jackson's depressive symptoms and sleep disturbance.

Based on Dr. Thrasher's recommendation that Jackson was undermedicated, CMT requested, pursuant to 33 U.S.C. § 907(e), an independent medical examination to determine if Jackson was

---

[1] Dr. Newfield referred Jackson to a psychiatrist, Dr. Deborah Giorgi-Guarnieri. Dr. Giorgi-Guarnieri began treating Jackson on November 14, 2011. Dr. Giorgi-Guarnieri's notes indicate that she treated Jackson every two to four weeks. Dr. Giorgi-Guarnieri recorded that Jackson had been battling depression and anxiety and suffered from flashbacks and nightmares. Dr. Giorgi-Guarnieri continued to see Jackson for medication management.

7

receiving proper medical care. In light of this request, the Office of Workers' Compensation Programs referred Jackson to psychiatrist Dr. Paul Mansheim for an independent medical examination. Dr. Mansheim evaluated Jackson on November 15, 2012, and reviewed Jackson's medical records, as well as the results of a standardized personality assessment inventory test. In his December 8, 2012 report, Dr. Mansheim stated that the diagnoses suggested by the personality assessment inventory test were extremely broad and suggested PTSD, schizophrenia, and major depressive disorder. Dr. Mansheim, however, "rule[d] out the [PTSD] diagnosis" because Jackson "did not experience a threat to himself" and "was never in danger" during the accident. J.A. 154. Dr. Mansheim further opined that Jackson demonstrated "significant evidence of malingering, attempting to appear more ill than is actually the case." J.A. 155. Dr. Mansheim concluded that Jackson was able to work as a longshoremen.

After reviewing Dr. Mansheim's report, CMT – who had voluntarily paid Jackson temporary total disability benefits – terminated its payments on December 17, 2012.

C.

Jackson filed a claim for disability benefits under the LHWCA, alleging that he suffered from PTSD as a result of the

work-related incident.[2] CMT disputed the claim, arguing that Jackson was not entitled to compensation under the LHWCA for a psychological injury because he did not sustain a physical injury or was placed in immediate risk of physical injury by the incident. In other words, Jackson was not in the zone of danger. CMT further contended that the ALJ should give dispositive weight to Dr. Manshiem's conclusion that Jackson did not suffer from PTSD.

In his November 13, 2013 decision, the ALJ rejected CMT's "contention that a claimant cannot recover for psychological injury unless he sustains a physical injury or is placed in immediate risk of harm." J.A. 44. The ALJ held that "[l]ongshore case law has established that a claimant can obtain benefits for a work-related psychological injury," and declined "to carve out a negligence law based exception whereby claimants are not entitled to benefits if they are emotionally harmed

---

[2] In addition to filing a claim under the LHWCA, Jackson filed a claim with the Virginia Workers' Compensation Commission. The commission denied Jackson's claim for medical benefits and compensation, holding that Jackson was not in the zone of danger. See Jackson v. Ceres Marine Terminals, Inc., 769 S.E.2d 276, 277 (Va. Ct. App. 2015). The Court of Appeals of Virginia reversed, declining to adopt a zone of danger test under Virginia law. The court held that "psychological injury must be causally related to either a physical injury or an obvious sudden shock or fright arising in the course of employment, without a specific requirement that the claimant be placed at risk of harm." Id. at 280. The court remanded the case back to the commission to apply the correct legal standard. That case is currently pending.

without being physically harmed or threatened with physical harm." Id. Addressing the medical evidence, the ALJ first refused, as contrary to Board precedent, to accord dispositive weight to Dr. Manshiem's opinion. After weighing the evidence, the ALJ found that Jackson suffered from PTSD which was causally related to the March 28, 2011, work incident. The ALJ concluded that, because Jackson "is suffering from work-accident related PTSD," he was entitled to temporary total disability benefits and medical benefits under the LHWCA. Id. at 50.

CMT appealed, raising the same arguments to the Board. In its November 25, 2014 opinion, the Board rejected CMT's contention that the zone-of-danger test precluded Jackson from recovery in this case. The zone-of-danger test, the Board held, is a "tort concept which does not apply to the workers' compensation provisions of the Longshore Act." J.A. 10. The Board stated that CMT's "argument fails to acknowledge the critical distinction, [as recognized in Consolidated Rail], between tort actions, which rely on common law fault and negligence principles, and worker's compensation claims, which are not governed by those principles." Id. It is well established, the Board concluded, "that a work-related psychological impairment, with or without an underlying physical harm, may be compensable under the Act." Id. at 9-10.

10

In addition, the Board rejected CMT's contention that Dr. Mansheim's opinion should be given dispositive weight, holding that Dr. Mansheim's opinion "should be weighed along with the other medical opinions in the record." Id. at 12. Because the ALJ properly weighed the evidence, the Board affirmed the ALJ's finding that Jackson sustained a compensable work-related injury.

## II.

CMT has petitioned this Court for review, and we possess jurisdiction pursuant to 33 U.S.C. § 921(c). In reviewing the Board's decision, we must determine "whether the Board observed its statutorily-mandated standard for reviewing the ALJ's factual findings." Newport News Shipbldg. & Dry Dock Co. v. Stallings, 250 F.3d 868, 871 (4th Cir. 2001) (internal quotations and citations omitted). We are also guided by the principle that an ALJ's factual findings "shall be conclusive if supported by substantial evidence in the record considered as a whole." 33 U.S.C. § 921(b)(3). Substantial evidence requires "more than a scintilla but less than a preponderance." Norfolk Shipbldg. & Drydock Co. v. Faulk, 228 F.3d 378, 380–81 (4th Cir. 2000). Further, an ALJ's findings "may not be disregarded on the basis that other inferences might have been more reasonable. Deference must be given the fact-finder's . . . credibility

11

assessments, and . . . the scope of review of ALJ findings is limited." Newport News Shipbldg. & Dry Dock Co. v. Tann, 841 F.2d 540, 543 (4th Cir. 1988). In reviewing legal issues, the Board's "adjudicatory interpretation of the LHWCA is entitled to no special deference, and is subject to our independent review. However, a reasonable interpretation of the LHWCA by the Director should be respected." Stallings, 250 F.3d at 871 (internal quotations and citations omitted).

III.

The LHWCA was enacted to create a federal workers' compensation statute for longshoremen and harbor workers, in light of the Supreme Court's decision that state workers' compensation statutes constitutionally could not apply to injured maritime workers. See Nogueira v. N.Y., New Haven & Hartford R. Co., 281 U.S. 128 (1930). The LHWCA, like most workers' compensation legislation, represents a compromise between employer and employee. "Consistent with the central bargain of workers' compensation regimes - limited liability for employers; certain, prompt recovery for employees - the LHWCA requires that employers pay benefits voluntarily, without formal administrative proceedings." Roberts v. Sea-Land Servs., Inc., 132 S. Ct. 1350, 1354 (2012).

In other words, the LHWCA strikes a balance between the competing interests of injured workers and their employers in which the certainty of benefits is exchanged for tort immunity. See Morrison-Knudsen Constr. Co. v. Dir., OWCP, 461 U.S. 624, 636 (1983); Potomac Elec. Power Co. v. Dir., OWCP, 449 U.S. 268, 281-82 & n.24 (1980). The LHWCA, therefore, "imposes liability without fault and precludes the assertion of various common-law defenses . . . ." Potomac Elec. Power Co., 449 U.S. at 281; see also 33 U.S.C. § 904(b) ("Compensation shall be payable irrespective of fault as a cause for the injury.").

To be entitled to benefits under the LHWCA, a claimant must have sustained an injury within the meaning of the Act. See 33 U.S.C. § 903(a) ("Compensation shall be payable under this [Act] in respect of disability . . . of an employee, but only if the disability . . . results from an injury."); see also Metro. Stevedore Co. v. Rambo, 515 U.S. 291, 294 (1995) (stating that the LHWCA "is a comprehensive scheme to provide compensation in respect of disability or death of an employee . . . if the disability or death results from an injury occurring upon the navigable waters of the United States"). Section 902(2) of the LHWCA provides,

> The term "injury" means accidental injury or death arising out of and in the course of employment, and such occupational disease or infection as arises naturally out of such employment or as naturally or unavoidably

13

results from such accidental injury, and includes an injury caused by the willful act of a third person directed against an employee because of his employment.

33 U.S.C. § 902(2).

Injuries are presumed to be work related under 33 U.S.C. § 920 after the claimant establishes a prima facie case that the injury not only was caused by the employment, but that it also arose during employment. See U.S. Indus. Fed. Sheet Metal, Inc. v. Dir., OWCP, 455 U.S. 608, 615 (1982) ("Not only must the injury have been caused by the employment, it also must have arisen during the employment."). "Once the presumption is invoked, the burden shifts to the employer to rebut it through facts - not mere speculation - that the harm was not work related." Conoco, Inc. v. Dir., OWCP, 194 F.3d 684, 687-88 (5th Cir. 1999). "If the ALJ finds that the employer rebutted the presumption, then the ALJ must weigh all of the evidence to determine whether the harm was caused by the claimant's employment." Ramsey Scarlett & Co. v. Dir., OWCP, 806 F.3d 327, 331 (5th Cir. 2015).

IV.

In its petition for review, CMT makes two primary arguments. First, CMT argues that Jackson did not suffer a compensable injury within the meaning of the LHWCA because he

14

was not in the zone of danger; that is, only those who suffer a physical injury or were within the zone of danger of physical impact can recover for a work-related psychological injury. Because Jackson was outside of the zone of danger, CMT asserts, he did not suffer any compensable injury under the LHWCA. Second, CMT contends that the ALJ committed error by failing to give Dr. Mansheim's opinion dispositive weight. The Director maintains, on the other hand, that it is well established that psychological injuries – with or without physical injury or the threat of physical injury – are compensable under the LHWCA. The Director further contends that Dr. Mansheim's opinion was not entitled to dispositive weight and is not binding on the factfinder. For the reasons explained below, we agree with the Director on both issues.

### A.

CMT does not dispute that Jackson can recover for a psychological injury under the LHWCA. Rather, CMT contends that Jackson cannot, under the LHWCA, recover for a psychological injury unless he sustains a physical injury or was placed in immediate risk of physical harm. In support of this argument, CMT relies exclusively on the zone-of-danger test set forth by the Supreme Court in Consolidated Rail – a case that did not involve the statute at issue in this case. CMT's contention is not only inconsistent with the statute's text, the structure of

15

the statute, and precedent but is also contradicted by the very reasoning of the case on which it relies so heavily – Consolidated Rail.

The LHWCA plainly does not encompass such a limitation by its express terms. The LHWCA does not distinguish between psychological and physical injuries – the statute simply says "injury." See 33 U.S.C. § 902(2) (defining "injury," without limitation, as any "accidental injury or death arising out of and in the course of employment"). Nowhere in the statute is there a requirement that psychological injuries be accompanied by actual or threatened physical harm. To be sure, Congress could have easily written the statute to contain such a requirement, but it did not. We therefore refuse to "amend [the] statute under the guise of statutory interpretation, a task we are not at liberty to perform." Newport News Shipbldg. & Dry Dock Co. v. Hall, 674 F.2d 248, 251 (4th Cir. 1982). For good reason. The zone-of-danger test is, after all, a "well-established common-law concept of negligence." Consolidated Rail, 512 U.S. at 555 (quotations and alterations omitted). The rules of the common law for tort actions, however, generally do not apply to cases arising under LHWCA – a "no-fault workers

16

compensation scheme."[3]  See <u>Newport News Shipbldg. and Dry Dock Co. v. Brown</u>, 376 F.3d 245, 249 (4th Cir. 2004).

Further, courts interpreting § 902(2) of the LHWCA have held that claimants can recover for a work-related psychological injury, and have never mandated actual or threatened physical harm to be a prerequisite for coverage.  See, e.g., <u>Pedroza v. Dir., OWCP</u>, 624 F.3d 926, 931 (9th Cir. 2009) ("It is well settled that a psychological impairment, which is work related, is presumed to be compensable under the Act.  Therefore, to receive the benefit of this § 920(a) presumption, the claimant must prove not only that he has a psychological impairment, but that an accident occurred, or working conditions existed, which could have caused the impairment." (citation omitted)); <u>Dir., OWCP v. Potomac Elec. Power Co.</u>, 607 F.2d 1378, 1385 (D.C. Cir. 1979); <u>Am. Nat'l Red Cross v. Hagen</u>, 327 F.2d 559, 561 (7th Cir. 1964).  Nor has the Board endorsed such a limitation.  See, e.g., J.A. at 9-10 ("[I]t is well established that a work-related psychological impairment, with or without an underlying physical harm, may be compensable under the Act.").

---

[3] We recognize that, under certain limited circumstances, the longshore worker may seek damages in a statutory negligence action from the owner of the vessel on which he was injured under 33 U.S.C. § 905(b).  This case does not present such circumstances.

17

Moreover, CMT's reliance on Consolidated Rail is wholly misplaced. In Consolidated Rail, a case in which a railroad worker experienced severe psychiatric problems after witnessing the death of a fellow worker while on the job and was required to continue working within sight of the coworker's body, the Supreme Court held that claims for negligent infliction of emotional distress are cognizable under the Federal Employers' Liability Act ("FELA"). 512 U.S. at 550. But to curtail what it believed might otherwise be "unpredictable and nearly infinite liability for defendants," id. at 552, the Court adopted the zone-of-danger test developed as common law in many jurisdictions. Id. at 554-55. The Court expressly stated that FELA was not a workers' compensation statute and emphasized that the basis of an employer's liability under FELA is its negligence, which turns on common-law principles. Unlike the statute at issue here, FELA "does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur." Id. at 543 (quoting Ellis v. Union Pac. R. Co., 329 U.S. 649, 653 (1947)). Thus, by its terms, Consolidated Rail is inapposite to a claim for workers' compensation benefits under the LHWCA.

18

Because we are not free to engraft on the statute a requirement that Congress did not place there, we decline to adopt the zone-of-danger test.

B.

CMT next contends that the ALJ erred in failing to give the report of Dr. Mansheim, an independent medical examiner appointed pursuant to 33 U.S.C. § 907(e), dispositive weight. We disagree, as there is nothing in the plain language of the statute that indicates that Congress intended to give the opinion of an independent medical examiner dispositive weight or to make the examiner's opinion binding on the parties.

Section 7(e) provides in part,

> In the event that medical questions are raised in any case, the Secretary shall have the power to cause the employee to be examined by a physician employed or selected by the Secretary and to obtain from such physician a report containing his estimate of the employee's physical impairment and such other information as may be appropriate. <u>Any party who is dissatisfied with such report may request a review or reexamination of the employee by one or more different physicians employed or selected by the Secretary</u>. The Secretary shall order such review or reexamination unless he finds that it is clearly unwarranted.

33 U.S.C. § 907(e) (emphasis added). Were we to read the statute as CMT does, we would nullify the second clause of § 907(e), which provides the opportunity for further review by another physician if a party is dissatisfied with the

19

independent medical examiner's opinion. We therefore decline CMT's invitation to do so, as the second clause clearly indicates that the independent medical examiner's opinion is not binding on the ALJ or the parties. Rather, the independent medical examiner's opinion must be weighed along with the other medical opinions of record, as the Board has repeatedly held. See Cotton v. Newport News Shipbldg. & Dry Dock Co., 23 B.R.B.S. 380, 387 (1990); Shell v. Teledyne Movible Offshore, Inc., 14 B.R.B.S. 585 (1984).

Our interpretation of this provision is not only consistent with other circuits but is also consistent with the position advanced by CMT in a separate case. In Ceres Marine Terminal v. Hinton, 243 F.3d 222 (5th Cir. 2001), CMT argued, "an opinion of a Department of Labor IME is entitled to great weight. This is not to say that the Department of Labor IME's opinion is dispositive." Compare Br. of Pet., Ceres Marine Terminal v. Hinton, 243 F.3d 222 (5th Cir. 2001) (No. 00-60171), 2000 WL 34004373, at *46, with CMT's Br. at 40 ("Dr. Mansheim's opinion should have been dispositive. . . . Indeed, isn't the whole purpose of a section 7(e) evaluation to resolve the case?"). The Fifth Circuit rejected CMT's argument, holding that the ALJ's conclusions – after weighing all the medical evidence, including the independent medical examiner's report – must only

be "supported by substantial evidence in the record as a whole." Hinton, 243 F.3d at 225.

CMT further argued in Hinton that if the ALJ "is going to reject the Department of Labor IME's opinion, the [ALJ] needs a very good reason for doing so." Br. of Pet., Hinton, 2000 WL 34004373 at *46. Here, CMT should take solace in the fact that the ALJ provided several "good reason[s]" in giving less weight to Dr. Mansheim's opinion. One reason, among many, was Dr. Mansheim's unsubstantiated statement that the traumatic event experienced by Jackson – the prime actor in this incident – would not meet the criteria for PTSD because, if Jackson qualified, then more than half the population would meet the diagnosis, as that population has seen an image of a mangled body. The ALJ concluded that "Dr. Manshiem's estimates on population experience raise concerns that his report is not well-reasoned and well-documented." J.A. 49. Indeed.

Because the statute clearly does not contemplate an ALJ giving dispositive weight to an independent medical examiner's opinion, we decline to "amend [the] statute under the guise of statutory interpretation." Hall, 674 F.2d at 251.

C.

In weighing the evidence as a whole, the ALJ found the opinions of Jackson's treating psychologist, Dr. Newfield, and CMT's expert psychiatrist, Dr. Thrasher, credible; both

21

physicians diagnosed Jackson with PTSD and concluded that this diagnosis was causally related to the work accident. The ALJ further found that those opinions outweighed Dr. Mansheim's opinion that Jackson did not meet the criteria for a diagnosis of PTSD. CMT's arguments on appeal, in effect, seek a reweighing of the evidence, which we are not empowered to do. Thus, the ALJ's conclusion that Jackson suffered a work-related psychological injury is amply supported by substantial evidence when the record is considered as a whole.

V.

For the foregoing reasons, CMT's petition must be denied.

PETITION FOR REVIEW DENIED

22